**Elsa O. HOFMANN, Plaintiff,**

v.

**PRESSMAN TOY CORPORATION and Susan Adamo, Defendants.**

**Civ. A. No. 90–132.**

United States District Court,
D. New Jersey.

Nov. 16, 1990.

Elsa Ostergaard Hofmann, pro se.

Crummy, Del Deo, Dolan, Griffinger & Vecchione by W. Drew Kastner, Newark, N.J., and Cowan, Liebowitz & Latman by Joseph H. Lessem, New York City, for defendants.

## OPINION

DEBEVOISE, District Judge.

Plaintiff Elsa O. Hofmann brought this copyright infringement action under 17 U.S.C. §§ 101 *et seq.*, claiming that defendant Pressman Toy Corporation ("Pressman") and its employee, Susan Adamo, infringed on plaintiff's copyrighted board game, called the Prehistoric Animal Game, by manufacturing and marketing another board game entitled Dizzy Dizzy Dinosaur. The parties have cross-moved for summary judgment.

At the outset, I should note an unusual feature of this case. Plaintiff's suit raises a number of questions under the federal copyright law, questions which have at least the potential for complexity. While defendants are represented by two capable law firms, plaintiff herself appears *pro se.* Since she lacks the specialized training of a lawyer, plaintiff is hardly well-equipped to do legal battle with the defendants. For this reason, in deciding these motions I have, in a sense, acted as plaintiff's advocate. I have gone beyond the parties' submissions in support of their respective motions, and every piece of evidence submitted in the course of the proceedings has been carefully reviewed, in an effort to locate anything that would weigh in plaintiff's favor. In addition, every reasonable factual inference has been drawn which would support plaintiff's case. Finally, the relevant body of law has been exhaustively reviewed, to determine if there is any plausible legal argument for plaintiff's position, regardless of whether plaintiff thought to make that argument herself.

The discussion below explains why, even when viewed in the best possible light, plaintiff's complaint must be dismissed.

## FACTUAL BACKGROUND

### 1. The Prehistoric Animal Game.

Plaintiff apparently began developing board games in 1983 or 1984, and began developing dinosaur board games in 1984. *See* Deposition of Elsa O. Hofmann, at 6, 8 (July 10, 1990) ("Hofmann Dep.").[1] Plaintiff developed several versions of the game entitled Prehistoric Animal Game, and from 1984 through 1988, she applied for and obtained at least five (5) copyright registrations for the various versions of that game. *Id.* at 19–21, 29–34, 42–43, 54–56, 63–64.

There are at most four versions of the Prehistoric Animal Game relevant here, and I provide a detailed description of each, based on the undisputed facts in the record.[2]

---

1. After this deposition was taken and a transcript was prepared, plaintiff made a number of "corrections" which, in fact, consist of substantial additions and deletions of material. While this is perhaps somewhat irregular, for the purposes of these cross-motions, I consider all material which plaintiff added to the deposition transcript, and I do not consider any material which plaintiff deleted from the transcript.

2. An earlier version of the game was developed in 1984. Plaintiff does not allege that defendants' game infringes on her 1984 version. *See* Hofmann Dep. 26.

In her 1985 version (the "1985 Game")[3], players[4] start at a "mud flat" located in the lower left-hand corner of the gameboard,[5] and move along an irregular path of dinosaur "footprints" toward a "cave" near the middle of the gameboard. *See generally* Hofmann Dep. 26–29 and Exhibit 2; Affidavit of Joseph H. Lessem (Sept. 28, 1990) ("Lessem Aff."), Exhibit B.[6] Under the rules of the game, each player moves about on the footprints by correctly answering questions about dinosaurs, with the object being to reach the cave in the center with his or her playing piece.[7] Hofmann Dep. 29. There is only one "mud flat" or starting point, one path of dinosaur footprints, and one entrance to the cave.

The footprints are in the form of a somewhat abstract, geometric outline. *Id.* at 184. Specifically, each footprint is an irregular, geometric shape; the bottom and the sides are straight lines, with the sides flaring out from the bottom at obtuse angles. The top of the shape consists of three curves or humps, the middle one being somewhat larger than the ones at either side. These humps represent "toes." *Id.* at 185. The path of footprints, as noted, is somewhat irregular, curving counterclockwise toward the center. *Id.* at 188–89.

The mud flat is a brown or tan square area, which is apparently drawn to look like mud. The cave (which is somewhat shrouded in the surrounding pictorial background, described below), has a flat bottom and rounded sides which curve to meet one another at the top. *Id.* at 190. The cave is grey, except for the arched entrance in the center, which is black.

In addition to the footprints, mud flat and cave, the gameboard includes a pictorial background of foliage, a body of water, one dinosaur and sky. *Id.* at 27, 192, 193. The pictorial background is, more or less, one continuous picture.

All of the representations on the gameboard, including the pictorial background, mud flat, and cave, while of course artistic renditions, are nonetheless of a "realistic" nature, that is, they are the product of an effort to depict accurately the objects drawn. As noted, the footprints, in contrast, are abstract and geometric.

The 1986 version of the Prehistoric Animal Game (the "1986 Game") is, in many respects, similar to the 1985 Game. *See generally id.* at 36–40; Exhibit 6. The 1986 Game still consists of an irregular path of dinosaur footprints, starting at a mud flat at the lower left-hand corner, and moving in a counterclockwise fashion toward a cave, with a single entrance, near the center of the board. *Id.* at 39, 189, 191. The cave and mud flat, although slightly different in appearance from the 1985 Game, are still accurately described by the prior description.

There are, however, a number of differences between the 1985 and 1986 Games. First, the footprints in the 1986 Game, although still in outline form, *id.* at 184, are less abstract, and are designed to provide a more realistic representation of actual dinosaur footprints. *Id.* at 48–49. Specifically, each footprint consists of a large blade-like toe that flares out and four smaller blade-like toes, each of which comes to a point like a claw, and each of which is connected to the rest of the foot. *Id.* at 186. Some

---

**3.** In her complaint plaintiff did not allege any infringement of the 1985 Game, *see* Complaint ¶ 6, and in her deposition she only claimed infringement of later versions of the game. However, in her "corrections" to the deposition transcript, plaintiff stated a claim for infringement of the 1985 Game, and I will treat this claim as an amendment to her complaint. *See* Hofmann Dep. 30.

**4.** The playing pieces for all versions of plaintiff's dinosaur games are intended to be small figures in the shape of dinosaurs. Hofmann Dep. 24, 179.

**5.** The gameboard in all relevant versions of plaintiff's games is square.

**6.** Exhibit 2 to plaintiff's deposition and Exhibit B to Mr. Lessem's affidavit provide four photographs of the relevant gameboards for plaintiff's four versions of the Prehistoric Animal Game. While I cite specific additional material in the record, these photographs form the primary basis for the description of plaintiff's gameboards.

**7.** Plaintiff does not claim that defendants have infringed on the rules of her 1985 Game. Hofmann Dep. 26, 31.

of the footprints have a single, large, black dot or circle in the center. *Id.* at 36.

Second, while the gameboard still includes a pictorial background, it is quite different from the 1985 Game. While the 1985 Game has a continuous pictorial background covering the entire board, in the 1986 Game the gameboard is divided between a portion which is a solid green background and a portion which is solid blue. *Id.* at 193. Superimposed on this background are a number of separate, individual pictures of dinosaurs and foliage (as well as, of course, the mud flat and cave). *Id.* at 193, 196–97. As in the 1985 Game, those depictions are of a "realistic" nature.

Finally, the play of the 1986 Game is somewhat different. *See generally* Hofmann Dep., Exhibit 6. Players move about not by answering questions but by the roll of an ordinary six sided die.[8] When a player lands on a footprint with a large black dot or circle in the center, the player is supposed to follow instructions (written on the gameboard) for how to proceed (e.g., lose a turn, roll again, etc.). Hofmann Dep. 36–38. In addition, every time a player lands on a footprint with a black dot, the player also "collect[s] a dinosaur footprint" which is noted on a scorecard. Hofmann Dep., Exhibit 6. The object of the game is to be the first player to reach the cave in the center having collected six footprints.

In early 1987 plaintiff developed yet another version of the Prehistoric Animal Game (the "Early 1987 Game").[9] *See generally* Hofmann Dep. 50, 52–54; Exhibit 7–B. While in the Early 1987 Game the players still start at a mud flat and move along a path of dinosaur footprints toward a cave in the center of the board, there are several differences from the earlier versions.

First, in the Early 1987 Game there are four mud flats or starting points (one in each corner), and each player starts from his or her own mud flat. The mud flats, in contrast to the earlier games, are mostly abstract; basically, they are simple, black ovals. Likewise, the cave in the center has four entrances rather than one and is an abstract design; it is orange and rounded and the four arched entrances are black. Hofmann Dep. 191.

Second, while the shape of the footprints is the same as in the 1986 Game, in the Early 1987 Game they are a solid white color and do not have dots or other markings on them. Moreover, the location of the footprints is quite different. Instead of a single path starting in one corner and curving toward the center, in the Early 1987 Game there are eight separate paths of footprints, each forming a more or less straight line. Specifically, there are four separate paths running along each side of the gameboard, connecting the four "mud flats" located in the corners. In addition, there are four diagonal paths running from the cave in the center toward the mud flats in the corners. *Id.* at 189–90.

Third, the background of the Early 1987 Game is a solid moss green color; superimposed on this background are four separate pictures of dinosaurs. *Id.* at 193–94.

Finally, plaintiff again altered the rules for the Early 1987 Game.[10] Essentially,[11] while the players still move about the board according to the roll of a die, they must also answer various questions about dinosaurs. For each correctly answered question a player "gets a dinosaur footprint" as in the 1986 Game. Again, the object of the game is to be the first player to reach the cave having collected six dinosaur footprints.

---

**8.** Apparently, in another version of the 1986 Game the players would move by a spinner. Hofmann Dep. 38–39.

**9.** The defendants contend that this version of the game was developed after February 1987. At her deposition, plaintiff stated that the Early 1987 Game was developed in March 1987, but in her "corrections" she changed her answer to January 1987. Hofmann Dep. 50. For the purposes of these motions I assume that plaintiff's

Early 1987 Game was developed in January 1987.

**10.** Again, plaintiff does not contend that the defendants infringed on the rules for her Early 1987 Game. Hofmann Dep. 57–58.

**11.** The complete rules are set forth in Hofmann Dep., Exhibit 7–B.

Plaintiff developed the fourth and final version of the Prehistoric Animal Game at issue here later in 1987 (the "Late 1987 Game").[12] *See generally* Hofmann Dep. 52–54, 61–62; Exhibits 9–A to 9–D. In many respects, the Late 1987 Game is similar to its earlier cousin. There are still four mud flats as starting points in the corners of the gameboard and a cave with four entrances in the center. The caves in the two 1987 versions of the game are virtually identical, *id.* at 191; the mud flats are also unchanged (except as noted below). The footprints in the Late 1987 Game are the same shape and follow the same paths as in the Early 1987 Game. *Id.* at 190. The background of the gameboard is still moss green with pictures of dinosaurs superimposed on it, although there are more dinosaur pictures than in the Early 1987 Game. *Id.* at 193–94.

The gameboard for the Late 1987 Game differs from the Early 1987 Game primarily in that plaintiff added a color scheme. *See generally id.* at 61. First, each mud flat and each corresponding footprint on the paths leading from the mud flats to the cave has a large colored circle or dot in it; a different color is used for each mud flat and corresponding path of footprints (specifically, the colors are red, blue, pink and yellow). *Id.* at 184. Second, the footprints along the sides of the gameboard also have colored circles or dots in them, alternating between black and orange. These black and orange dots correspond to a change in the rules which requires the players to answer two different categories of questions; the category is determined by whether the player lands on a footprint with an orange or a black dot. Finally, although the rules of the Late 1987 Game are somewhat more complex than the Early 1987 Game, the basic object is still to move the pieces along the path of footprints while successfully answering questions about dinosaurs.

### 2. Dizzy Dizzy Dinosaur.

Defendants make a number of allegations concerning the development of the allegedly infringing game, Dizzy Dizzy Dinosaur, at least some part of which plaintiff may dispute. Fortunately, it is unnecessary to delve into these allegations in any detail, because one fact, which plaintiff has never disputed, is decisive: Dizzy Dizzy Dinosaur was publicly displayed, in substantially its present form, at a toy fair in February 1987. *See* Affidavit of James Pressman (Sept. 26, 1990) ("Pressman Aff."), ¶ 21; *see also* Affidavit of Susan Adamo ("Adamo Aff."), ¶¶ 4, 11.

Nor is there any dispute over the proper description of Dizzy Dizzy Dinosaur, a board game for two to four players. *See generally* Pressman Aff., Exhibit A; Lessem Aff., Exhibit B. The game consists of a gameboard, twenty plastic playing pieces (called "movers"), dice and a plastic wind-up figure in the shape of a dinosaur. Hofmann Dep. 179–82.

The gameboard is square, with a brown or tan background, and with various drawings superimposed on it. *Id.* at 182–83, 192, 196–97. The drawings are yellow, blue, red, green or white. All of the drawings on the gameboard are of a cartoon like quality. In each corner of the gameboard there is a starting place, indicated by the word "start" and a drawing that is predominately one color (either red, blue, yellow or green). The red drawing appears to be a number of semi-active volcanos. The blue drawing appears to be a pond or a lake. The yellow drawing appears to be mountains. The green drawing appears to be foliage.

Leading away from each starting place is a separate path of footprints; the color of

---

**12.** Defendants again contend that this version of the game was developed after February 1987. While it appears the Late 1987 Game was certainly registered with the United States Copyright Office after February 1987, and while it would appear the game was likewise developed after April 1987 (when the Early 1987 Game was registered), the matter is not entirely free from doubt, in part, perhaps, because plaintiff has so substantially altered her deposition transcript that her answers therein are difficult to ascertain. *See, e.g.,* Hofmann Dep. 60. Again giving plaintiff the benefit of the doubt, I will assume for the purposes of these motions that the Late 1987 Game was developed prior to February 1987.

each path of footprints corresponds to the color of the starting place from which it emanates. *Id.* at 183. The footprints themselves are all more or less identically drawn (except, of course, being of different colors). Each footprint consists of one large, uneven circle and three smaller, uneven circles. The smaller circles, which apparently represent toes, are not connected to the large circle nor to one another. *Id.* at 184–85, 186. Each of the four paths of footprints curves in a clockwise fashion toward the center of the gameboard, forming essentially concentric paths, leading to a cave. *Id.* at 186–88.

The cave has four entrances and each path leads to a separate entrance. *Id.* at 190. The cave is predominately white and, like every other feature on the gameboard, is drawn in a cartoon-like fashion to appear as if it has an uneven, rocky surface. The perimeter is the cave consists of four more or less straight sides; in between each side is an entrance, which arches inward toward the center of the cave.

In addition to the foregoing, scattered about the gameboard are various drawings of rocks (which are predominately white) and foliage (which is predominately green). These drawings appear to play no role in the game.

As noted the game also includes twenty "movers," five for each player. The movers, like the starting points, come in four colors (red, blue, yellow or green). Each mover has the following shape: a flat, horizontal top and bottom, with the bottom on a slightly raised platform, and a flat, vertical center connecting the top and bottom. For each mover there are two plastic labels which can be stuck on both sides of the center piece. The labels consist of various cartoon drawings of what might best be called "cave people"; the drawings appear on a solid, colored background, the color of which corresponds to the color of the mover. *See generally id.* at 180–81.

The two dice are six-sided. On each of five sides there is an arabic numeral, one through five. On the sixth side there is a cartoon drawing of the face of a dinosaur. *Id.* at 181.

The wind-up dinosaur figure is predominately green and is slightly larger than the individual movers. When the figure is wound-up and released upright on a flat surface, it will "spin[ ] around in a circle, careen[ ] off in one direction, stop[ ], spin[ ], careen[ ] off in another direction and so on, until the mechanism has wound down." Pressman Aff. ¶ 4.

The play of the game is relatively simple. *See generally* Pressman Aff., Exhibit B. The players place their movers at their respective starting places and, based on the roll of the dice, move them along their respective footprint paths toward the cave in the center, with the object being to reach the cave with all five playing pieces. A player may move a piece the number of spaces equal to the total number that appears on the dice, or the player may divide the roll between two movers. Once a player has gotten all five pieces out of start and onto the footprint path, the player may "stack" up to three movers on top of one another and move them as one piece.

The twist to the game is provided by the wind-up dinosaur figure. Anytime a player rolls a dinosaur face on either dice, the wind-up figure is wound, placed on the center of the board, and released. Any movers on the footprint paths which are knocked over or moved off the footprints must return to their respective starting places and begin again.

### 3. Plaintiff's Efforts to Market Her Games.

Beginning in 1985, plaintiff made several attempts to market various versions of her Prehistoric Animal Game, as well as other board games which she had developed. Hofmann Dep. 72. These efforts, which were unsuccessful, consisted largely of mailing letters to various companies which plaintiff thought might be interested in her games; in these letters, plaintiff would describe her games. *See, e.g., id.* at 80, 84–93. Occasionally, plaintiff would also send companies other material, such as copies of her rules, photographs of her gameboards, and in a few instances, actual prototypes of her games. *See, e.g., id.* at 77, 91–92, 94–

95.[13] In a few instances, plaintiff approached representatives of companies at toy fairs, and described her games to them. *See, e.g., id.* at 75, 102–03. Plaintiff also occasionally sought to market her games with the assistance of individuals who were unconnected with any particular company. *See, e.g., id.* at 98–99, 112–15. From the time when plaintiff began her efforts to market her games up through February 1987, she contacted approximately thirteen companies and two individuals regarding her games. *See id.* at 73–79, 84–99, 102–05. After February 1987, plaintiff contacted approximately an additional eleven companies and one individual regarding her games.

### 4. Plaintiff's Contacts with Defendants.

Plaintiff's first contact with the defendants occurred in March 1984, when she submitted by mail two of her games to them for consideration. Neither of these games was related to the Prehistoric Animal Game. The defendants wrote plaintiff in September 1984, informing her that they were not interested in either game. *See id.* at 158–59, 160–61.

Plaintiff's next contact with defendants occurred in 1985, when she met defendant Adamo at a toy fair. Following this encounter, in March 1985 plaintiff made an appointment to meet with Adamo, and submitted three games to her, none of which is related to the Prehistoric Animal Game. *Id.* at 159–60.

Plaintiff's next contact with defendants was a brief telephone call to Adamo in 1986. *Id.* at 163–64. When asked at her deposition whether she showed Ms. Adamo "anything regarding the Prehistoric Animal Game" she stated: "I don't think I showed her anything. I may have mentioned, but I don't think I did. I may have mentioned that I had it. I may have mentioned that I met Denise Dorsey–Zinn at the fair and had a dinosaur game." *Id.* at 164.[14]

Approximately a year later, in February 1987, plaintiff again sought out Adamo at a toy fair. Their brief conversation occurred in a foyer, and plaintiff did not show Adamo any of her work or discuss with Adamo the Prehistoric Animal Game at all. *Id.* at 165–66.

Finally, after the toy fair plaintiff sent to several companies, including defendant Pressman, a letter dated March 5, 1987, describing several of her games, including the Prehistoric Animal Game. Plaintiff's letter provided only a brief description of the game.[15] Plaintiff did not include a prototype of the game, a gameboard, or a copy of the rules with this letter, and she did not "think" that she had included a photograph of the gameboard. *Id.* at 167–69.

The foregoing describes the sum total of plaintiff's attempts to contact defendants in any way as part of her effort to market her games. *Id.* at 175–76.[16] At her deposition, plaintiff stated that outside the context of this lawsuit she had never sent defendants a prototype, a gameboard, a photograph of the gameboard, or a set of rules for her Prehistoric Animal Game. *Id.* at 203–04. Plaintiff further testified that she had no knowledge whatsoever that

---

**13.** In those instances where she provided her contacts with materials beyond a description of her games, it appears that those materials were returned to her. *Id.* at 79, 92, 95, 97, 99.

**14.** Denise Dorsey–Zinn is an employee of a competitor of the defendants.

**15.** The following is the entire discussion of the dinosaur game: "The *PREHISTORIC ANIMAL GAME* ®, is a dinosaur game on three levels. On the preschool level you just follow the dinosaur footprints, follow the directions on the gameboard and the child is familiarized with some of the names of dinosaurs and world

events at the time dinosaurs lived. On the budding genius level, stage II a player answers beginning level questions to win. On the genius level, Stage III, a player must answer difficult questions, but who doesn't like to learn about dinosaurs." Hofmann Dep., Exhibit 19.

**16.** Plaintiff did, however, write two further letters to defendants, in September 1988 and April 1989, accusing them of infringing on her work. *Id.* at 171–72, 174–75. In addition, of course, plaintiff has had various contacts with defendants' attorneys in connection with this lawsuit. *Id.* at 175.

anyone had ever provided the defendants with a copy of her Prehistoric Animal Game. *Id.* at 176.

## DISCUSSION

■ To make out a claim of copyright infringement, the plaintiff must show ownership of a valid copyright and "copying" of a protectible expression by the defendants, *see Whelan Associates, Inc. v. Jaslow Dental Laboratories, Inc.,* 797 F.2d 1222, 1231 (3d Cir.1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987), that goes so far as to constitute improper appropriation of plaintiff's work. *See Universal Athletic Sales Co. v. Salkeld,* 511 F.2d 904, 907 (3d Cir.), *cert. denied sub nom. Universal Athletic Sales Co. v. Pinchok,* 423 U.S. 863, 96 S.Ct. 122, 46 L.Ed.2d 92 (1975); *Midway Mfg. Co. v. Bandai–America, Inc.,* 546 F.Supp. 125, 138 (D.N.J.1982), *aff'd sub nom. Bandai–America, Inc. v. Bally Midway Mfg. Co.,* 775 F.2d 70 (3d Cir.1985), *cert. denied,* 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986). Because the defendants do not contest the fact that plaintiff has a valid copyright in her work, the question presented is whether plaintiff can prove "copying." "As it is rarely possible to prove copying through direct evidence, ... copying may be proved inferentially by showing that the defendant had access to the allegedly infringed copyrighted work and that the allegedly infringing work is substantially similar to the copyrighted work." *Whelan Associates,* 797 F.2d at 1231–32. *See also Gaste v. Kaiserman,* 863 F.2d 1061, 1066 (2d Cir.1988); *Franklin Mint Corp. v. National Wildlife Art Exchange, Inc.,* 575 F.2d 62, 64 (3d Cir.), *cert. denied,* 439 U.S.

880, 99 S.Ct. 217, 58 L.Ed.2d 193 (1978); *Midway Mfg.,* 546 F.Supp. at 138.

■ I find that based on the undisputed facts there is no evidence that defendants had access to plaintiff's work, and therefore her complaint should be dismissed. Because I base my conclusion on a lack of access, it is unnecessary to address whether defendants' game is "substantially similar" to any version of the Prehistoric Animal Game.[17]

There are three possible legal theories for proving access in a copyright case: (1) direct access; (2) access through third parties; and (3) "striking similarity" between the plaintiff's and defendants' work. Based on the undisputed facts, I find that there is no evidence supporting access via any of these theories.

### 1. Direct Access.

■ "In the context of copyright, it is well established that there must be evidence of a reasonable possibility of access. Access must be more than a bare possibility and may not be inferred through speculation or conjecture." *Gaste,* 863 F.2d at 1066. *See also id.* at 1067 ("[r]equiring a finding of a 'reasonable opportunity' for access adequately states the appropriate standard"). The plaintiff has the burden of proving access, which requires "sufficient, affirmative and probative evidence to support that claim." *Scott v. Paramount Pictures Corp.,* 449 F.Supp. 518, 520 (D.D.C.1978), *aff'd,* 607 F.2d 494 (D.C.Cir. 1979), *cert. denied sub nom. Hall v. Paramount Pictures Corp.,* 449 U.S. 849, 101 S.Ct. 137, 66 L.Ed.2d 60 (1980).

There is no dispute that defendants' game, Dizzy Dizzy Dinosaur, was publicly

---

17. Because plaintiff seems to dedicate some time and effort addressing certain issues which I do not consider, I briefly explain why those issues are irrelevant here.

First, plaintiff appears to think it is significant that defendants have no copyright for their game, Dizzy Dizzy Dinosaur. It is not. Whether a *defendant* in a copyright action possesses a valid copyright for the allegedly infringing work bears absolutely no relevance to whether a plaintiff has a claim under the copyright law.

Second, the parties have hotly disputed the existence (and alleged destruction in a flood) of

various documents relating to the development of Dizzy Dizzy Dinosaur. These documents would be relevant to this case *only if* plaintiff could prove copying through access and substantial similarity. In that case, defendants would be entitled to rebut plaintiff's case by showing that their game was in fact independently developed. However, because I find that plaintiff is unable to prove even the first element of her case, that is, access, it is unnecessary to reach this subsidiary issue and the parties' dispute over these documents is irrelevant.

displayed in substantially its present form in February 1987. Therefore, in order to make out her claim, plaintiff must show that defendants had access to her work before that date. *See Meta–Film Associates, Inc. v. MCA, Inc.*, 586 F.Supp. 1346, 1359 (C.D.Cal.1984) (submissions occurring after allegedly infringing work was produced do not, as a matter of law, satisfy requirement of access). Yet it is undisputed that outside the context of this lawsuit plaintiff has never sent defendants a prototype, a gameboard, a photograph of a gameboard, or a set of rules for her Prehistoric Animal Game. In her brief contacts with defendants in 1984, 1985 and February 1987, plaintiff did not even mention the Prehistoric Animal Game at all. In a brief telephone call with defendant Adamo in 1986 plaintiff "may have mentioned" that she "had a dinosaur game" but she did not "show[ ] her [Adamo] anything." Hofmann Dep. 164. Needless to say, the somewhat doubtful possibility [18] that plaintiff mentioned that she "had a dinosaur game" does not amount to "an 'opportunity to view or to copy' the plaintiff's work," *Meta–Film Associates*, 586 F.Supp. at 1355, which is required to prove access.

The only manner in which plaintiff has suggested defendants gained direct access to her work is her claim that they sent their agents or representatives to the United States Copyright Office, inspected the files of plaintiff's copyright registrations, and from that copied her work. Hofmann Dep. 176. Defendants, needless to say, deny this charge, Pressman Aff. ¶ 23, and more importantly plaintiff has absolutely

no evidence to support her theory.[19]  In this case plaintiff has offered only a "hypothetical scenario in spite of the fact that it is not supported by a shred of evidence.... This type of speculation is insufficient to avoid summary judgment on the question of access." *Meta–Film Associates*, 586 F.Supp. at 1355.

### *2. Access Through Third–Parties.*

Where a plaintiff cannot show direct access "[a]ccess through third parties connected to both a plaintiff and a defendant may be sufficient to prove a defendant's access to a plaintiff's work." *Gaste*, 863 F.2d at 1067. In *Gaste*, for example, the court refused to overturn a jury verdict finding access, where the plaintiff produced a witness who testified that he had given a copy of the copyrighted work to the owner of one of the defendant corporations. *Id.* at 1066. In other cases, likewise, access was found where there was "[w]ide publication of a work." *Midway Mfg.*, 546 F.Supp. at 146. *See also Selle v. Gibb*, 741 F.2d 896, 901 (7th Cir.1984) ("plaintiff may be able to establish a reasonable possibility of access when, for example, the complaining work has been widely disseminated to the public").

In this case, however, there is simply no evidence to support a claim of access through third parties. First, plaintiff's work, which has never been published, has never been "widely disseminated to the public." Plaintiff has only demonstrated that her work was sent to a total of approximately thirteen companies and two individ-

---

**18.** Plaintiff herself admitted that she did not "think" she actually mentioned that she had a dinosaur game in the 1986 telephone call. Hofmann Dep. 164.

**19.** At her deposition plaintiff candidly admitted that she had no evidence to support her theory that defendants copied her work from files kept at the Copyright Office. However, in her "corrections" to her deposition transcript plaintiff changed her answer to claim that she did have a basis for her claim, and presented it as follows:

When I received Pressman's Catalogue from you [Mr. Lessem], I noticed on the cover a game called *SPACE FACE*. I own the mark *SPACE* since 1986. In 1985, I showed Susan Adamo (Aff. Adamo, Sept.1990) my game

*SPACE RACE/* Dep. page 15, line 23, 24, 25 and page 16 you questioned me about on July 10, 1990. I own three 1987 Copyrights on this art game and the mark since 1986. How come if I did not show this game to Pressman, it winds up in their catalogue. I know there is a big turnover in the game industry, but Pressman infringes.

Hofmann Dep. 177. To put it kindly, plaintiff's "evidence" misses the mark. Even assuming arguendo that her claim is true, the fact that defendants infringed on the trademark for a game which plaintiff showed them directly has no relevance whatsoever to proving that defendants inspected the Copyright Office files kept on plaintiff's other games.

uals prior to February 1987, when defendants publicly displayed their allegedly infringing game. For the most part, plaintiff has not shown any connection between defendants and any of these other recipients of her work, and as plaintiff herself admitted she has no evidence that anyone ever provided defendants with a copy of her Prehistoric Animal Game. Hofmann Dep. 176. This case, then, is analogous to *Benson v. Coca–Cola,* 795 F.2d 973, 975 (11th Cir.1986), where the court held that the fact that plaintiff had performed his song around the country and had sent the song to various publishing companies did not establish access, where there was no evidence that the defendant's songwriters had visited the places where the song had been performed or had been employed by the companies which had received the song, or that another company had forwarded the song to the defendant. *See also Selle v. Gibb,* 741 F.2d at 898, 903 (where song had been performed three times and had been sent to eleven publishing companies "there was no more than a bare possibility" that defendants had access to plaintiff's song); *Testa v. Janssen,* 492 F.Supp. 198, 202 (W.D.Pa.1980) (no proof of access where plaintiffs gave their work to a third party but presented "[n]o competent evidence ... that defendants had access to plaintiffs' work while possessed by" the third party). Thus, the mere fact that plaintiff sent descriptions or even actual prototypes of her Prehistoric Animal Games to third parties cannot, without more, suffice to establish access.

█ The closest plaintiff ever comes to suggesting a basis for access through third parties are her allegations regarding a woman named Denise Dorsey–Zinn. *See* Hofmann Dep. 75–78, 97. Plaintiff claims that she showed her games, including the Prehistoric Animal Game, to Ms. Dorsey–Zinn in 1985, and later kept her up to date with subsequent developments. Plaintiff further alleges that Ms. Dorsey–Zinn, who works for another toy company, is a friend or acquaintance of defendant Adamo, and suggests that defendants might have gained access to plaintiff's work through that relationship, although, admittedly,

plaintiff has no direct evidence to show that this occurred. Defendant Adamo, in her affidavit, admits that she knows Ms. Dorsey–Zinn but unequivocally denies that Ms. Dorsey–Zinn ever showed or even mentioned to her any of plaintiff's games, including the Prehistoric Animal Game. Adamo Aff. ¶ 10.

There are cases where access via a third party may be proved, but this is not one of them. "In a number of cases, courts have found access when the alleged infringer and the intermediary occupy positions such that it is natural that information possessed by one would be imparted to the other." *Meta–Film Associates,* 586 F.Supp. at 1356. In such cases, the " 'intermediary,' the person who had viewed plaintiff's work and was therefore in a position to transmit it to the copier, either was a supervisor with responsibility for the defendant's project, was part of the same work unit as the copier, or contributed creative ideas or material to the defendant's work." *Id.* at 1355–56. Obviously, Ms. Dorsey–Zinn, an employee for a competitor of defendants, does not fit this description at all.

It is also true that "under certain circumstances, courts have drawn an inference of access in situations when the individual with knowledge of plaintiff's work and the defendant are not part of a business enterprise, but rather have dealings with one another." *Id.* at 1358. However, even in these cases "at a minimum, the dealings between the plaintiff and the intermediary and between the intermediary and the alleged copier must involve some overlap in subject matter to permit an inference of access." *Id.* Here, defendants' evidence, which plaintiff does not contradict, shows that defendants' limited dealings with Ms. Dorsey–Zinn were wholly unrelated to plaintiff's dealings with her.

A few cases which are directly on point will hopefully help plaintiff understand why she has failed to demonstrate access here. In *Ferguson v. National Broadcasting Co.,* 584 F.2d 111 (5th Cir.1978), the court described the facts as follows:

Here, the plaintiff showed that she had sent a copy of her composition to four individuals and two companies. Each copy was returned, and Williams [a defendant], in his affidavit, stated that he had no contact with any of the individuals or with Mills Publishing, one of the two companies. Although he admitted having had some contacts with Broadcast Music Incorporated (BMI), the other company, he stated that these contacts were not related to either the plaintiff or her composition. Furthermore, Williams stated he had never heard of the plaintiff or her composition prior to this copyright infringement action. Plaintiff adduced no evidence contradicting Williams' statement.

*Id.* at 113. From these facts the court concluded:

> [A] finding of access in this case would be based on speculation or conjecture, and this is impermissible.... To support a finding of access there must be a reasonable possibility of access—not a bare possibility as we have in this case.

*Id.* Likewise, in *Evans v. Wallace Berrie & Co.*, 681 F.Supp. 813 (S.D.Fla.1988), the plaintiff alleged access to her unpublished work

> by virtue of its dissemination to nineteen other named publishers. The gravamen of Plaintiff's theory seems to be that by virtue of her work being provided to a variety of other publishers, these Defendants somehow had access also. Plaintiff, however, has not alleged that Defendants had any connection with these other nineteen publishers, with the exception of one, Marvel Comics, nor does this Court find any inference of connection between these Defendants and any other named publisher from any of the pleadings to support this theory. A finding of access simply cannot be based on speculation of conjecture.

*Id.* at 816. Likewise, the court rejected plaintiff's argument that access was shown because plaintiff's work was submitted to a third party who had had dealings with defendants on an unrelated matter. *Id.*

### 3. "Striking Similarity".

■ Finally, where a plaintiff does not have direct evidence of access, "then an inference of access may still be established circumstantially by proof of similarity which is so striking that the possibilities of independent creation, coincidence and prior common source are, as a practical matter, precluded." *Selle v. Gibb*, 741 F.2d at 901. *See also Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir.), *cert. denied sub nom. Williams v. Baxter*, 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987); *Ferguson v. National Broadcasting*, 584 F.2d at 113. Once again, however, based on the undisputed facts, and drawing every reasonable inference in plaintiff's favor, I find that plaintiff cannot show that defendants' Dizzy Dizzy Dinosaur game is strikingly similar to any version of plaintiff's Prehistoric Animal Game at issue here.[20]

Plaintiff has the burden of proving striking similarity, *Selle v. Gibb*, 741 F.2d at 905, and that burden is not carried "if the evidence as a whole does not preclude any reasonable possibility of independent creation." *Gaste*, 863 F.2d at 1068. Striking similarity, then, goes far beyond the measure for substantial similarity required for the second element of a copyright claim. *Meta–Film Associates*, 586 F.Supp. at 1355. Where, as here, the "plaintiff has introduced virtually no direct evidence of access, the degree of similarity to establish copying ... is considerable." *Selle v. Gibb*, 741 F.2d at 903 n. 4. The "similarities should appear in a sufficiently unique or complex context as to make it unlikely that both pieces were copied from a prior common source, ... or that the defendant was able to compose the accused work as a

---

**20.** I note in passing that the Seventh Circuit has held that even when striking similarity is shown, there must still be "at least some other evidence which would establish a reasonable possibility that the complaining work was available to the alleged infringer." *Selle v. Gibb,* 741

F.2d at 901. Not all courts appear to follow this approach, but I need not address this issue here because régardless of whether plaintiff could present other evidence of access she cannot show striking similarity.

matter of independent creation." *Id.* at 904.

In those few instances where courts have found striking similarity sufficient to prove access, the facts have shown that "in virtually every detail, the defendants' games are *identical* to the plaintiff's." *Midway Mfg. Co. v. Dirkschneider,* 543 F.Supp. 466, 482–83 (D.Neb.1981) (emphasis added).

To say the least, plaintiff's and defendants' games are hardly identical in *any* respect, and as a consequence it is impossible to conclude that the two games are "strikingly similar." Without repeating the factual discussion above, *see supra* at 2–13, I briefly outline here the salient highlights. First, there are, at best, only the following similarities between the Prehistoric Dinosaur Game and Dizzy Dizzy Dinosaur:[21]

1. Players in both games move along a path of dinosaur footprints. In two versions of the Prehistoric Animal Game, the footprints curve toward the center, as do the footprints in Dizzy Dizzy Dinosaur. In two *other* versions of the Prehistoric Animal Game there are four separate paths leading from the starting point to the end; there are also four paths of footprints in Dizzy Dizzy Dinosaur.

2. In the Prehistoric Animal Game the footprints lead to a cave in the center of the gameboard as in Dizzy Dizzy Dinosaur. In Dizzy Dizzy Dinosaur and in two versions of the Prehistoric Animal Game, the caves have four arched entrances.

3. In Dizzy Dizzy Dinosaur and in one version of the Prehistoric Animal Game four separate colors are assigned to the four starting points and the four paths leading from the starting points to the cave. In Dizzy Dizzy Dinosaur these colors are blue, red, yellow and green.

In the Prehistoric Animal Game they are blue, red, yellow and pink.

4. In three versions of the Prehistoric Animal Game the players, in part at least, move according to the roll of a die. In Dizzy Dizzy Dinosaur the players move according to the roll of a pair of dice.

5. The object of both games is to get the playing pieces into the cave.

6. Both games have some kind of pictorial background. In Dizzy Dizzy Dinosaur and in some versions of the Prehistoric Animal Game, the pictorial background includes foliage and a body of water.

However, in addition to these few common features, there are numerous and substantial differences between the Prehistoric Animal Game and Dizzy Dizzy Dinosaur, to wit:

1. All versions of the Prehistoric Animal Game have one or more "mud flats" as starting points. There are no "mud flats" in Dizzy Dizzy Dinosaur.

2. The shape and design of the footprints in Dizzy Dizzy Dinosaur are completely different from the shape and design of the footprints in all four versions of the Prehistoric Animal Game.

3. The footprints in Dizzy Dizzy Dinosaur comprise four concentric paths curving clockwise toward the center. No version of the Prehistoric Animal Game has footprints which follow this pattern. In the two versions of the Prehistoric Animal Game where the single path of footprints does curve toward the center, it goes in a counterclockwise direction.

4. Aside from the common feature of four entrances found in two versions of the Prehistoric Animal Game, the cave in Dizzy Dizzy Dinosaur is completely dis-

---

**21.** I note here that, again to give plaintiff every possible benefit of the doubt, I am comparing all four versions of the Prehistoric Animal Game with Dizzy Dizzy Dinosaur, even though any single version of the former game does not contain all the similarities listed in the text.

I also note that many of the similarities noted are not, in fact, copyrightable expressions, but rather are uncopyrightable ideas which flow from the idea of a board game with a dinosaur motif. For example, in *Evans v. Wallace Berrie,* 681 F.Supp. at 818, the court found no striking similarity between two works which shared "an uncopyrightable idea of an undersea world. Certain characterizations used in both are simply *scenes a faire,* which would be common to most children's undersea stories."

similar from the cave in all four versions of the Prehistoric Animal Game.

5. In three versions of the Prehistoric Animal Game the game, in part, requires players to answer questions about dinosaurs. This feature is not found in Dizzy Dizzy Dinosaur.

6. While the die used in the Prehistoric Animal Game is an ordinary six-sided die, the dice used in Dizzy Dizzy Dinosaur are completely dissimilar, containing arabic numerals on five sides and the face of a dinosaur on the sixth side.

7. The pictorial backgrounds of the two games are completely dissimilar. Although some images (e.g., foliage, water) appear in both, they are completely dissimilar in appearance. Moreover, there are several pictures in the Prehistoric Animal Game which have no counterpart whatsoever in Dizzy Dizzy Dinosaur. For example, while all versions of the Prehistoric Animal Game contain at least one drawing of a dinosaur, Dizzy Dizzy Dinosaur has no dinosaur drawings.

8. In Dizzy Dizzy Dinosaur each player has five pieces, which are plastic objects with pictures of cave people on them. In the Prehistoric Animal Game each player has only one piece, which is intended to be a plastic model of a dinosaur.

9. In three versions of the Prehistoric Animal Game the players must "collect dinosaur footprints" in order to win. There is no similar feature in Dizzy Dizzy Dinosaur.

10. In one version of the Prehistoric Animal Game the players follow instructions written on the gameboard. There is no such feature in Dizzy Dizzy Dinosaur.

11. The central feature of Dizzy Dizzy Dinosaur is a wind-up dinosaur. When a player rolls the dice and a dinosaur face appears, the wind-up dinosaur is released on the gameboard to wreak havoc among the playing pieces. No version of the Prehistoric Animal Game con-

tains anything remotely resembling this distinctive feature.

Thus, this case stands in sharp contrast to those few instances where courts have found striking similarity. For example, in *Goldman–Morgen, Inc. v. Dan Brechner & Co.*, 411 F.Supp. 382 (S.D.N.Y.1976), the court found access based on the "striking similarity" between two novelty coin banks, *id.* at 388–89, which were described as follows:

> [Both banks] depict a comic girl with four faces, under a tuft of yellow hair. There are captions under each face, and these captions are *identical* on each bank. In both banks, the money is inserted into a slot just under the hair, on the face captioned "I am happy today." This face and the three others are *identical* in design and coloring. The two banks are also *identical* in size. There is an inconsequential difference of shading on the buttons and collars of the figures. I therefore find that the two banks are *identical in every respect.*

*Id.* at 385–86 (emphasis added). In this case, whether the games are considered as a whole, or examined in detail, the conclusion is inescapable that they are not strikingly similar; far from being "identical in every respect," the numerous differences between the games far outweigh their common features.

## CONCLUSION

Despite an exhaustive search of the record and comprehensive review of the case law, I conclude that, based on the undisputed facts, there is no evidence to support the first element necessary to prove that defendants infringed on plaintiff's copyrighted work, namely, that they had access to that work. Therefore, I deny plaintiff's motion for summary judgment, grant the defendants' cross-motion, and dismiss plaintiff's complaint with prejudice.[22]

**22.** I note two other matters. First, there are a few outstanding motions by plaintiff for dis-

covery and one for a preliminary injunction. In light of the disposition of the instant motions, these motions are denied as moot. Further, the material sought in the discovery motions bears no relevance to the issues addressed in this opinion.

Second, because I have received numerous evidentiary submissions from plaintiff which may not have been filed with the clerk's office, I am directing that these materials be filed, to insure that there is a complete record.