Paul A. ROGINSKI, Plaintiff,

v.

TIME WARNER INTERACTIVE, INC., Atari Games Corp., SEGA of America, Inc., Defendants.

No. 3:CV–96–0182.

United States District Court, M.D. Pennsylvania.

June 20, 1997.

**822**

George W. Croner of Kohn Savett, Klein & Graf, Philadelphia, PA, for Plaintiff.

A. Sidney Katz of Welsh & Katz, Ltd., Chicago, IL, for Defendants.

## MEMORANDUM

VANASKIE, District Judge.

Plaintiff Paul A. Roginski (Roginski) filed this copyright infringement action against defendants Time Warner Interactive, Inc., Atari Games Corp. and Sega of America, Inc., alleging that defendants copied Roginski's unpublished manuscript entitled "Awesome Possum" when the defendants created a video game and accompanying comic book—"Awesome Possum Kicks Dr. Machino's Butt." (Dkt. Entry 1.) The defendants filed a motion for summary judgment, claiming, *inter alia*, that their products were independently created and that there was no evidence that the defendants had access to Roginski's manuscript. (Dkt. Entry 31.) Because defendants have demonstrated that

the concept of an "awesome possum" · was independently created and Roginski has failed to show that the defendants had reasonable access to Roginski's work or that there are striking similarities between the two works which would warrant an inference of defendants' access to the infringed work, the motion for summary judgment will be granted.

## I. BACKGROUND

### A. Creation of Roginski's "Awesome Possum"

In late January of 1993, Roginski began working on a children's story with an environmental theme entitled "Awesome Possum." (Def's Supporting Exhibits (Dkt. Entry 33) Exhibit HHH.)[1] Although Roginski originally envisioned the "Awesome Possum" in 1985, he did not tell anyone about his story until after he began writing his story in January 1993. (Def's Stat. of Facts (Dkt. Entry 31) ¶ 14; Plf's Stat. of Facts (Dkt. Entry 38) ¶ 14.) On March 31, 1993, Roginski filed a copyright application with a copy of the manuscript with the Copyright Office. (Def's Supporting Exhibits (Dkt. Entry 33) Exhibit HHH.) On May 11, 1993, Roginski received a letter from his counsel forwarding a certificate of copyright registration. (*Id.*)[2] With his copyright registration in hand, Roginski mailed his manuscript (or summaries of his manuscript) to Wait Disney Company, Boyds Mills Press, the Council for Indian Education, Houghton Mifflin Company, Paulist Press, John Muir Publications, Redbud Books, Dutton Children's Books, and Advocacy Press. (Plf's Stat. of Facts (Dkt. Entry 38) ¶ 3.)

### B. Creation of Defendants' "Awesome Possum"

In April of 1992, well before Roginski even began his manuscript, Richard Seaborne was hired by defendant Tengen.[3] (Def's Support-

---

1. Exhibit HHH is a time line prepared by the defendants and submitted during oral argument. As Roginski did not object and the time line is well-established, Exhibit HHH will be cited as setting forth the pertinent sequence of events.

2. Prior to May of 1993, Roginski only revealed his story to his wife, son, brother and a few other close friends.

3. Tengen was the corporate predecessor of defendant Time Warner Interactive.

ing Exhibits (Dkt. Entry 33) Exhibit HHH.) After learning that Tengen intended to develop an environmental game, Seaborne suggested a character entitled "Awesome Possum." (*id.*) [4] On July 17, 1992, Seaborne presented his "Rad Rhino and Awesome Possum" game proposal to the management of Tengen and obtained approval for the development of the game. (*Id.*) [5] By the fall of 1992, the design team was developing the computer graphics for the "Awesome Possum." (*Id.*) Because these initial designs were unsatisfactory, on January 18, 1993, Jules Marino was hired by Tengen to reanimate the "Awesome Possum" character. (*Id.*) [6]

Because of a dispute as to the name of the video game, a market test was conducted in April of 1993, which revealed that "Awesome Possum" was the most popular name and character. (Def's Supporting Exhibits (Dkt. Entries 34) Exhibit W.) On May 13, 1993, the name of the video game was set as "Awesome Possum Kicks Dr. Machino's Butt." (*Id.* Exhibit GG.) [7]

At some point, the design team determined that a comic book would be drafted and placed within the "Awesome Possum" video game's instruction manual. Several design team members and a professional writer drafted different versions of the comic book. As a result of these different efforts, the design team members are uncertain as to whose draft actually became the final version of the comic book. (Plf's Stat. of Facts (Dkt. Entry 38) ¶ 9.)

## C. Roginski's Awesome Possum

In his story, Roginski creates a possum, Ozzie, whose wife and children were threatened by the logging of the forest. After losing two trees in which Ozzie and his family had made their home, Ozzie confronted the loggers. Because of his small size, Ozzie could do nothing to stop the loggers and escaped the loggers by "playing possum." Ozzie was then approached by Mother Nature, a spirit who wanted Ozzie to lead the animals against the destruction of the forest. Ozzie reluctantly agreed, although he did not understand what he could do to stop the humans. In his first encounter with other animals, Ozzie was chased by a cougar and saved when Mother Nature caused a bolt of lightning to strike the cougar. Because the other animals thought that Ozzie had somehow defeated the cougar, they began to call him the "awesome possum." As a result of this, Ozzie found that many animals were willing to join in his fight against the destruction of the forest. When the other animals joined Ozzie's crusade, they were required to give an oath to protect the land and the other animals.

Ozzie, however, still had no idea as to how the animals could successfully fight against the human loggers. As Mother Nature instructed, Ozzie went to visit Philo the Owl. Ozzie's transportation both to and from the place where Philo the Owl resided was provided by an eagle. Philo the Owl told Ozzie that the animals could not fight against the humans through force. Instead, the animals had to draw the attention of other humans to the destruction of the forest so that those humans would force the loggers to stop. With this advice in mind, Ozzie rejoined the other animals.

Through teamwork, the other animals convinced two of the loggers that destruction of the forest was wrong. These loggers then went to their supervisors as well as the me-

---

4. Seaborne alleges that he conceived of "Awesome Possum" for a high school public speaking class in 1984. Seaborne, however, was unable to document this assertion.

5. Originally, the game was entitled "Graphic the Warthog." Apparently, there was dissatisfaction with this character, which allowed Seaborne to gain support for his concept of the "Awesome Possum."

6. These events are significant because they occurred before Roginski began writing his manu-

script. Therefore, these facts demonstrate that the concept of the "awesome possum" in a video game setting with an environmental theme was independently created by Tengen's design team.

7. These events are significant because they occurred before Roginski began mailing his unpublished manuscripts to various publishers. Thus, the defendants had developed and named their game before Roginski ever disseminated his unpublished manuscript to any third parties—aside from his family and a few close friends.

dia to tell about the strange things that they witnessed. Through Ozzie's leadership, the other animals constructed barriers similar to beaver dams to block the logging road. After the media filmed these strange events, the logging was stopped and the forest was spared.

### D. Defendants' Awesome Possum

Defendants' instructional comic book began with a possum living in a forest with his parents and siblings. Abruptly, robot-loggers came into the forest and cut down his home. The possum avoided the robot-loggers by "playing possum." The possum then allied himself with "Rad Rhino" and "Killer Bee" and demolished the robot-loggers. After seeing the possum battle against the robot-loggers, Killer Bee used the term awesome, which the possum then adopted as his own name. The possum swore that he would fight against the destruction of the earth and the environment and then set out to find the source of the world's pollution. The possum traveled to the city, where he discovered that Dr. Machino was the source of the pollution and destruction. The possum then tracked Dr. Machino to the arctic, where he battled robot-hounds and was saved by an Arctic Tern. The possum chased Dr. Machino to his off-shore oil rig, where he fought robot-sharks with the assistance of "Manta Ray." Finally, Awesome Possum cornered Dr. Machino at his headquarters, a garbage dump, and defeated him—"kicked his butt."

## II. STANDARD OF REVIEW

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Facts that could alter the outcome are material facts." *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 197 (3d Cir.), cert.

denied, 513 U.S. 1022, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

Initially, the moving party must show the absence of a genuine issue concerning any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 329, 106 S.Ct. 2548, 2555–56, 91 L.Ed.2d 265 (1986). All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *See White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir.1988); *Continental Ins. Co. v. Bodie*, 682 F.2d 436 (3d Cir.1982). Once the moving party has satisfied its burden, the nonmoving party "must present affirmative evidence to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 256–57, 106 S.Ct. at 2514. The affirmative evidence must consist of verified or documented materials. Mere conclusory allegations or denials taken from the pleadings are insufficient to withstand a motion for summary judgment once the moving party has presented evidentiary materials. *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990). Rule 56 requires the entry of summary judgment, after adequate time for discovery, where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

In a copyright infringement case, a plaintiff must show (1) that he owned a valid copyright; and (2) that the defendant copied the plaintiff's work. *See Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 290 (3d Cir.), cert. denied, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991); *Whelan Assocs. v. Jaslow Dental Lab.*, 797 F.2d 1222, 1231 (3d Cir.1986), cert. denied, 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987). In this case, there is no dispute that Roginski had a valid copyright in his manuscript entitled "Awesome Possum" as of March 31,

1993. The issue is whether the defendants' copied Roginski's story. More precisely, as Roginski observes, "the principal issue on summary judgment is whether Plaintiff has produced sufficient evidence so that a reasonable juror, drawing all justifiable inferences in favor of Plaintiff and presuming Plaintiff's version of any disputed fact to be correct, could conclude that Defendants copied Plaintiff's work." (Plf's Mem. in Opp. to Def's S.J. Mot. (Dkt. Entry 44) at 8.)

## III. DISCUSSION

The record establishes that the defendants had envisioned an "awesome possum" character before Roginski had even begun to write his manuscript. Defendants clearly did not copy Roginski's generic idea of an "awesome possum" in an environmental theme. At oral argument, Roginski's counsel conceded that the record had established that defendants were working on the "awesome possum" video game with an environmental theme prior to Roginski's work and that a copyright infringement claim based upon the video game would be tenuous, at best. Given defendants' strong evidence that it was in the process of creating the "awesome possum" video game prior to Roginski's work, Roginski cannot maintain a claim for infringement based upon the video game. *See Grubb v. KMS Patriots, L.P.*, 88 F.3d 1, 3 (1st Cir. 1996) ("Such prior creation renders any conclusion of access or inference of copying illogical.").

Roginski argues, however, that defendants copied his manuscript in their comic book, which was included in the "Awesome Possum Kicks Dr. Machino's Butt" instruction manual. Therefore, the narrow issue left to resolve is whether there is sufficient evidence to support a claim that defendants copied Roginski's story in the production of their comic book.

It is often impossible to demonstrate a copyright infringement by direct evidence as a defendant will rarely admit that he or she copied the plaintiff's work. Therefore, copyright infringement can be established by demonstrating inferentially that: (1) the defendant had access to the material; and (2) the defendant's work is substantially similar

to the plaintiffs work. *See Whelan Assocs.*, 797 F.2d at 1231–32.

The plaintiff must first demonstrate that the defendant had reasonable access to his or her product. There are three manners in which a defendant's access can be demonstrated: (1) direct access; (2) access through a third party; and (3) "striking similarities" between the works such that there is no reasonable way that the defendant could have arrived at the end product without copying the plaintiff's work. *See Hofmann v. Pressman Toy Corp.*, 790 F.Supp. 498, 505 (D.N.J.1990), *affd. mem.*, 947 F.2d 935 (3d Cir.1991), *cert. denied*, 503 U.S. 963, 112 S.Ct. 1569, 118 L.Ed.2d 214 (1992). If a plaintiff cannot establish that the defendant had access to his or her work, then a copyright claim cannot be maintained. *Id.; see also Grubb*, 88 F.3d at 3.

### A. There Is No Competent Evidence of Access to Roginski's Work

There is no evidence of direct access in this case. In this regard, it is undisputed that Roginski never sent a copy of the manuscript to the defendants. Further, there is no evidence of third party access. In this regard, there is no evidence that the book publishers to whom Roginski sent his manuscript shared it with any of the defendants. Moreover, those book publishers do not have any relationship with any of the defendants such that access could be assumed. Under these circumstances, no rational trier-of-fact could conclude that defendants had access to Roginski's manuscript simply because he made it available to others. As one court, in rejecting a similar argument, explained:

> Plaintiff's works were never provided to the Defendants. Instead, Plaintiff alleges access to her unpublished work by virtue of its dissemination to nineteen other named publishers. The gravamen of Plaintiff's theory seems to be that by virtue of her work being provided to a variety of other publishers, these Defendants somehow had access to it also.... A finding of access cannot be based on [such] speculation or conjecture.

*Evans v. Wallace Berrie & Co., Inc.*, 681 F.Supp. 813, 816 (S.D.Fla.1988) (citations omitted).

Roginski argues that the defendants could have obtained access to the manuscript through the Copyright Office, pointing out that after this case was filed defense counsel obtained a copy of his manuscript from the Copyright Office. Such an argument must also fail. The Copyright Office permits parties to copy a file only under limited circumstances—none of which would have permitted the defendants to get a copy of the manuscript during the development of the comic book.[8]

■ Roginski next argues that the defendants may have obtained a copy of the manuscript from the Library of Congress. (Def's Stat. of Facts (Dkt. Entry 38) ¶ 2.) In terms of access, the plaintiff must demonstrate that such access was *reasonably* possible. A finding of access, however, cannot be the product of speculation or conjecture. *See Hofmann,* 790 F.Supp. at 505 (citing *Gaste v. Kaiserman,* 863 F.2d 1061, 1066 (2d Cir. 1988)); *see also Grubb,* 88 F.3d at 3 ("To satisfy its burden of showing access, the plaintiff must produce evidence from which a reasonable finder of fact could infer that the defendant had a reasonable opportunity to copy his or her work."); *Moore v. Columbia Pictures Indus., Inc.,* 972 F.2d 939, 942 (8th Cir.1992). Roginski theorizes that the defendants, in a rush to complete their video game before the Christmas buying season and inexperienced in the preparation of comic book stories, conducted a search of the Library of Congress for any stories involving a possum fighting against the environment, found Roginski's 60–page manuscript, and then copied small portions of that manuscript into a 12 page comic book. No competent evidence exists that such an effort was undertaken. Indeed, there is no competent evidence that the manuscript was even in the Library of Congress at the time the alleged copying occurred.[9] "It has been held that the mere fact that a plaintiff's manuscript is physically in the same city in which the alleged infringer resides does not furnish the reasonable opportunity to view the manuscript and thus constitute access, notwithstanding the bare physical possibility of such viewing." *Selle v. Gibb,* 567 F.Supp. 1173, 1181 (N.D.Ill.1983), *aff'd,* 741 F.2d 896 (7th Cir.1984). In this case, Roginski has not even shown that any agent of the defendants went to Washington to undertake a literature search. Accordingly, a determination of third party access through the Library of Congress would not be reasonable; instead, it would be the product of the grandest type of conjecture and speculation. *See Higgins v. Woroner Prods., Inc.,* 161 U.S.P.Q. (BNA) 384 (S.D.Fla.1969) (fact that document was in Copyright Office and Library of Congress and that defendant's President was in Washington, D.C. insufficient to warrant trial on access issue).

### B. Defendants' Comic Book Is Not Strikingly Similar to Roginski's Work

Even where there is no evidence of direct access, "an inference of access may still be

---

**8.** Under 37 C.F.R. § 201.2(d)(2)(i)-(iii) (1996), the Copyright Office can allow a file to be copied if (1) the claimant authorizes it; (2) the Copyright Office receives a written request from an attorney representing a party in litigation involving the copyright; or (3) the Copyright Office receives a court order. Counsel for the defendants concede that they were able to get a copy of Roginski's manuscript through 37 C.F.R. § 201.2(d)(2)(ii)—namely by submitting a written request identifying the related litigation and promising that the material would be used solely in connection with that litigation. Prior to this litigation, however, defendants would not have had an acceptable basis for obtaining Roginski's unpublished manuscript from the Copyright Office.

**9.** At oral argument, Roginski's counsel conceded that he did not know whether Roginski's manuscript was in the Library of Congress. Roginski believes that a copy of his manuscript may have been deposited at the Library of Congress because Dorrance Publishers indicated in correspondence that it had noticed that Roginski's manuscript was located at the Library of Congress. (Plf's Stat. of Facts (Dkt. Entry 38) ¶ 2.) Roginski has produced only a copy of this letter, which is dated June 20, *1994,* and states that "[o]ne of our researchers has come across the manuscript that you registered with the Library of Congress ...." (*id.*) This letter is plainly hearsay evidence (probably double hearsay evidence). It is dated nearly one year after the alleged copying occurred. It is not authenticated, and its contents are unverified. Under these circumstances, the letter is plainly inadequate to create a genuine issue as to whether defendants procured Roginski's manuscript from the Library of Congress.

established by proof of similarity so striking that the possibilities of independent creation, coincidence and prior common source are, as a practical matter, precluded." *Hofmann,* 790 F.Supp. at 505; *see also Lipton v. Nature Co.,* 71 F.3d 464, 471 (2d Cir.1995); *Baxter v. MCA, Inc.,* 812 F.2d 421, 423 (9th Cir.), *cert. denied,* 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987).[10] The courts, however, have disagreed on whether "striking similarities" standing alone are sufficient to establish that a defendant had access to the plaintiff's work. *Compare Arthur Rutenberg Homes, Inc. v. Berger,* 910 F.Supp. 603, 608 (M.D.Fla.1995) ("Generally, courts have held that access can be shown indirectly from striking similarities despite the existence of uncontradicted sworn denial of access by the other party."); *with Takeall v. Pepsico. Inc.,* 809 F.Supp. 19, 22 (D.Md.1992) (finding that striking similarity, when standing alone, is insufficient to support a finding of access and that the plaintiff must present additional circumstantial evidence to establish a reasonable probability of access), *affd. mem.,* 14 F.3d 596 (4th Cir.1993), *cert. de-*

*nied,* 512 U.S. 1236, 114 S.Ct. 2742, 129 L.Ed.2d 861 (1994). Regardless of whether additional evidence of access should be required, a comparison of Roginski's and defendants' works does not disclose the type of similarities that would permit a reasonable juror to infer that defendants copied Roginski's product.

■ In establishing *substantial* similarities between literary works, a plaintiff must demonstrate "articulable similarities between plot, themes, dialogue, mood setting, pace, characters, and sequence of events." *McCormick v. Fugerson,* 1995 WL 580339, at *2. Although Roginski must satisfy the more stringent "striking similarity" test to establish the defendants' access, it is appropriate to consider the same factors which courts have utilized in considering other literary works under the "substantially similar" test.

■ Roginski has outlined a number of similarities which he claims rise to the level of "striking similarity." Each of these simi-

---

10. As noted earlier, to establish an inference of copying a plaintiff must show (1) that the defendant had access to the product and (2) that the defendant's product is substantially similar to the plaintiff's product. *Whelan Assocs.,* 797 F.2d at 1231–32. In determining whether the defendant had access to the plaintiff's product, a plaintiff can demonstrate that the products share "striking similarities" such that there is no reasonable means through which the defendant could have created its product other than by copying the plaintiff's product. *Hofmann,* 790 F.Supp. at 508; *see also Selle v. Gibb,* 741 F.2d 896, 905 (7th Cir.1984); *Tuff 'N' Rumble Management, Inc. v. Profile Records, Inc.,* No. 95–246, 1997 WL 158364, *4 (S.D.N.Y. Apr. 2, 1997); *Repp v. Webber,* 858 F.Supp. 1292, 1303 (S.D.N.Y.1994). Therefore, the "striking similarities" test applies to the determination of whether a reasonable inference of *access* can be inferred from the similarities between the two products. Further, the "strikingly similar" test is a much more difficult standard than the "substantial similarities" test. In an average copyright case, the defendant has been given access to the product and the "substantial similarities" test is utilized to determine whether an inference of *copying* may be inferred from the similarities between the two products. In a case in which there is no evidence of the defendant's access to the copyrighted product, the "striking similarities" test is used to determine whether an inference of *access* may be inferred from the similarities between the products. Of course, a determination that simi-

larities are so striking as to infer *access* to plaintiff's product will necessarily determine that the similarities are also so substantial as to warrant an inference that the defendant copied the plaintiff's product.

A simple reason exists to explain this seemingly odd dichotomy. If Roginski had mailed a copy of his manuscript to the defendants, then the law would require that he only demonstrate that "substantial similarities" exist between his product and the defendants' product. If the defendants had actual access to Roginski's work, it would be more difficult to explain similarities and more likely that a defendant improperly copied Roginski's product. But where, as here, there is absolutely no evidence that the defendants had access to Roginski's manuscript, Roginski must demonstrate that there are "striking similarities" between his product and the defendant's product. If the defendants did not have access to Roginski's manuscript, it follows that the defendants could not have copied Roginski's manuscript. Thus, the dichotomy of the "striking similarities" and "substantial similarities" tests evolved as a result of the different inferences which attach to each test. Where access is actually established, it is more likely that copying occurred and less evidence of similarities is required. Where access is not established, it is less likely that copying occurred and a stronger resemblance of the two works is needed to support an inference of access.

larities will be considered in turn.[11]

### (1) Description of the Possum

Roginski notes that his "Awesome Possum" is an environmental superhero who is described by other animals as a "magnificent marsupial."[12] The defendants' "Awesome Possum" is described as an environmental "mega-hero," who is also described as a "mild-mannered marsupial" and "marsupial mega-hero."[13] Although Roginski claims that his possum was a superhero, this term is never used in his manuscript. In fact, Roginski's possum does not really resemble an average cartoon superhero—Ozzie never uses any "superpowers" to protect the forest. On the other hand, the defendants' possum is initially portrayed in a superhero garb and pose on the first page of the comic. The defendants' possum also physically battles with the forces of evil to protect the world. A careful review of Roginski's manuscript and the comic book demonstrate that the term "superhero" more readily applies to the defendants' character—not Roginski's.

11. The following similarities are taken from a comparison chart prepared by Roginski. (Plf's Opp. Exhibits (Dkt. Entry 45) Exhibit 24.)

12. When used as a noun, the term marsupial means "a marsupial mammal: one of the Marsupialia." *Webster's Third New International Dictionary* 1386 (1993). The term "Marsupialia" is defined as "an order comprising the lowest existing mammals except the Monotremata and containing the kangaroos, wombats, bandicoots, opossums, and related animals that with few exceptions develop no placenta, have a pouch on the abdomen of the female containing the teats and serving to carry the young." *Id.* When marsupial is used as an adjective, it is defined as "having a pouch for carrying the young." *Id.*

13. Roginski attempts to bolster his arguments of striking similarity by noting that, unlike the comic book, the video game does not contain any reference to the possum's background. This argument fails to recognize that Roginski bears the burden of demonstrating that the comic book is so strikingly similar to his own manuscript that the defendants could not have reasonably created their product except by copying it. The fact that the defendants added certain elements to their comic book which were not included in their video game does not demonstrate that defendants' comic book and Roginski's manuscript shared striking similarities. Further, a careful review of the comic book belies Roginski's claim.

Further, the coincidental use of the term marsupial cannot be considered a striking similarity. A possum is a marsupial. In writing any story about a possum, it cannot be considered striking that the defendants described their possum as a marsupial.[14]

### (2) The Element of a Family

Roginski's possum has a wife and numerous children. On two occasions, the tree in which Ozzie's family is living is cut down by loggers. On both occasions, Roginski's possum was able to avoid death by "playing possum." Defendants' possum had a mother, father and siblings. On only one occasion, defendant's possum was forced from his home by robot-loggers and "plays possum" to avoid them. Although there are very general similarities, these similarities amount to nothing more than generalized concepts which could easily be applied by any writer creating an environmental story about a possum.[15] The fact that defendants' possum has a family is not striking, especially where the family structure between the two works is different—defendants' possum is a sibling,

Aside from a few minor additions, the comic book substantially mirrors the video game—a video game which the defendants have established was independently created.

14. Defendants did not use Roginski's term "magnificent marsupial" to describe their possum. Instead, the defendants used the term "mild-mannered" to describe the awesome possum's disposition. The use of such a term to describe a superhero is not surprising. For example, Superman is known for his "mild-mannered" disposition while incognito as Clark Kent. Further, Underdog was introduced as a mild-mannered "shoe shine boy" until the cries of the innocent required use of his superpowers. In using the term "mild-mannered," defendants may have been modeling their superhero in a similar fashion.

15. It is important to recall that it is undisputed that the defendants' concept of the "Awesome Possum" was created in July of 1992, six months before Roginski even began to write his manuscript. Further, the environmental theme of the video game was determined as early as April of 1992. Thus, with these broad themes in mind, the court must consider whether the similarities between defendants' comic book and Roginski's manuscript naturally flow from the general theme of an environmental story about a possum battling to regain his home and protect the earth.

while Roginski's possum is a father and husband. Further, the fact that the possum lives in a forest which is threatened by loggers is not striking given the environmental theme that the defendants were pursuing.[16] Finally, the fact that both possums avoid danger by "playing possum" is a general similarity which would result from any story about a possum.[17] Furthermore, this portion of the comic book simply reproduces an aspect of the video game—Awesome Possum is able to "play possum" to avoid certain enemies.

### (3) The Naming of Awesome Possum

In Roginski's story, Mother Nature told Roginski's possum that if he ever needed help that he could call on her. Then, Mother Nature ordered Roginski's possum to save the forest from the human loggers. Almost immediately, Roginski's possum was confronted by a cougar which tried to eat the possum. Just as the cougar was about to strike, Roginski's possum called upon Mother Nature for help and a bolt of lightning struck the cougar. The other animals were so amazed by this occurrence that they began using the name "awesome possum."

In the defendants' comic book, the possum battles through the robot-loggers with the assistance of two allies, Killer Bee and Rad Rhino. At the conclusion of the fighting, Killer Bee says to defendants' possum that "you are pretty awesome for a possum." Defendants' comic shows the possum contemplating the term "awesome possum." There is not one instance in the entire comic in which another animal uses the name "awesome possum." It appears to be a self-given title. Further, it is undisputed that the term "awesome possum" was created independent of Roginski's manuscript. It cannot be considered striking that another animal used the term awesome to describe a possum who was a superhero.[18]

### (4) The Oath

In Roginski's manuscript, the animals which follow Roginski's possum must make a pledge to the possum to protect the land and other animals. In the defendants' comic book, the possum takes a pledge to "seek out all those who would spoil the planet and then I'll give them a solid boot to the backside." Roginski claims that the presence of an oath in each story demonstrates striking similarity. First, it should be noted that Roginski's possum never took any form of an oath. Even in his conversations with Mother Nature, he indicated that he was reluctant to lead any causes and stated that he could do nothing to stop the loggers. Mother Nature had to give Roginski's possum a direct order to lead a fight against the loggers. This attitude is in sharp contrast to the defendants' possum, who, while assuming a superhero-like pose, volunteers his oath to kick any polluter's butt. At the time that defendants' possum made this oath, he did not know that Dr. Machino was the mastermind behind the world's pollution. When the defendants' possum discovers the source of the world's pollution, he sets out to "kick his

---

**16.** This is further emphasized by the fact that the video game's first level involved a battle in a rain forest against robot loggers. In a July 15, *1992* "Technical Design Review" document, the video game's creators explain that "[t]he game lead-in shows ... mechanized destruction of a forest." (Def's Supporting Exhibits (Dkt. Entry 33) Exhibit N, Exhibit 1) This document also describes the First game level as a "deep tropical rain forest" with a "Robot Cuisinart (lots of blades whirling) [who] normally chops trees down." (*Id.* at 15.) It is thus clear that the concept of the forest and robot loggers was developed as early as July of 1992, and constitutes material which was independently created. (*Id.*)

**17.** Roginski also contends that both possums aggressively defend their homes. Although this is true to a certain degree, there is a vast difference between the manner in which this defense is accomplished. Roginski's possum's initial efforts at individual resistance are futile and nearly cost the possum his life. Throughout the remainder of the story, Roginski's possum refuses to fight the human loggers with force because he knows that the humans will destroy the animals. On the other hand, defendants' possum, with the assistance of several allies, becomes a skilled warrior. Defendants' possum does not avoid confrontation; instead, he hunts down Dr. Machino with the sole intent to "kick his butt." Thus, there is a major disparity between the characteristics of the two possums.

**18.** For example, it would not be uncommon for an observer of Superman to comment that he was "super" in some fashion.

butt"—as he swore he would do. Therefore, the oath in the comic book directly relates to defendants' video game and the possum's quest to kick Dr. Machino's butt.

### (5) Other Alleged Similarities

Roginski alleges that there are other similarities. First, Roginski notes that his possum lived near a garbage dump for a short period of time, while in defendants' comic book, Dr. Machino's base is a garbage dump. Roginski admits that the circumstances through which the garbage dumps appear are dissimilar. Further, Roginski cannot maintain that it is striking that the defendants chose to utilize a garbage dump as a level in an environmental video game or as a scene in a comic book accompanying the game.

Roginski also alleges that defendants' copied a portion of his manuscript in which an animal objects to being called a moose and states that he prefers to be called an Elk. Roginski claims that this is strikingly similar to a scene in which Dr. Machino calls defendants' possum a rodent and defendants' possum objects by noting that he is a marsupial. There is no other similarity between the scenes. There is no other similarity between the characters. Roginski does not contend that his possum was ever called a rodent and objected in such a manner. Although there is a tenuous connection between the humor involved, the similarities are simply not striking.

Roginski also notes that his possum gets a ride on the back of an eagle when he visits Philo the Owl for advice. In the defendants' story, the possum is saved from robot hounds by an arctic tern. But it is not uncommon in a story involving a small animal for that creature to get a ride on the back of a large bird.[19] Further, the birds were different, the settings were different and the circumstances were different.

Roginski also contends that the purpose of his book and the defendants' comic book is the same—namely to encourage children to get involved with saving the environment.

Roginski notes that his story ends with the former lumberjacks planting trees in an effort to preserve the forest. At the conclusion of defendants' comic, the defendants encourage children to write to various environmental organizations. Roginski cannot claim to have a copyright interest on an environmental theme. Further, there is no indication that Roginski provided children with the environmental information that defendants' printed in their instruction manual. In fact, Roginski never actually encouraged children to become active in environmental causes; instead, he relied upon the indirect effect that his book would have. The defendants' encouragement and instruction to children on how to get involved with environmental organizations is not strikingly similar to anything that is contained within Roginski's manuscript.

### (6) The Plot, Theme, Mood, Setting, Pace, Characters & Events

Not only is Roginski's manuscript not strikingly similar to the defendants' work, there are overwhelming differences between the two stories. Although the beginning portion of both stories has some general similarities, these similarities quickly disappear. The possums have different missions. Roginski's possum has the limited task of saving his forest, while defendants' possum wants to save the world. Further, defendants' possum is battling against a criminal mastermind, while Ozzie's enemy is much less defined. The possums also have different personalities. Although Roginski's possum initially attempts to fight against the loggers, his efforts prove to be futile. Defendants' possum, on the other hand, continually battles all manner of robot creatures. After Roginski's possum's initial failures, he avoids confrontation, while defendants' possum actively seeks out such confrontation. Roginski's possum is reluctant to assume a role of leadership and has it thrust upon him, while the defendants' possum becomes a self-proclaimed superhero. In short, although there are some minor similarities as to common elements of the possums' backgrounds, their characters are vastly different.

---

**19.** For example, in Walt Disney's "Rescuers Down Under", the main characters, a pair of mice, obtain transportation on the back of an albatross *and* an eagle.

The general mood and pace of the two works is different. Roginski's manuscript has a somber and dark mood and a slow pace. Throughout much of the 62 page story, Roginski's possum expresses doubt as to whether he can succeed against the humans. The defendants' 12 page comic book has the opposite mood—it is hopeful and light. The defendants' possum never expresses doubt and rushes brashly against his foes. Further, given the brevity of the comic book, the defendants' story by necessity moves at a quick pace.

Although the initial forest setting is similar, Roginski's possum never leaves this setting. On the other hand, defendants' possum makes his way to the city, the arctic circle, an off-shore oil rig, and Dr. Machino's garbage dump. Defendants' story has significantly different settings which never appear in Roginski's manuscript. Further, the events are significantly different. Roginski's story has no battles between the animals and humans, while defendants' comic book is replete with such battles in many different settings.

Finally, the characters are not even remotely similar. Roginski has a typical forest cast of animals: mice, beavers, badgers, cougars, deer, moose, elk, squirrels and various birds. Defendants have distinct characters: Killer Bee, Rad Rhino, Arctic Tern and Manta Ray. There is no similarity between the characters in the respective stories.

This case is directly analogous to *Evans v. Wallace Berrie & Co.*, 681 F.Supp. 813 (S.D.Fla.1988). In that case, the plaintiff had an unpublished manuscript entitled "Snorkie Snorkel vs. Simon Shark." The defendants then created the children's animated cartoon, "The Snorks." Even though there were many general similarities, the court held that the similarities pertained to elements of the story which would be common to any story about an underwater world. This included such concepts as the "Snorks" themselves, as well as certain names that were virtually identical. Although there were certain coincidental similarities, the court held that a reasonable juror would not be able to conclude that the defendants' product could not have been independently created. As the court explained:

Both Plaintiff's story and Defendant's story involve an underwater world. Such similarities as using a sand dollar as currency, foods made of seaweed, seahorses for transportation and plates made of oyster or mother of pearl are not protected similarities of expression, but are more accurately characterizations that naturally flow from the common theme of an underwater civilization.... Similarities in descriptive characterizations are nothing more than *scenes a faire* because they are merely descriptions one would ordinarily associate with the underwater and ordinarily use if describing underwater events....

Plaintiff states a similarity of events, such as: snork characters using bubbles to scare off predators, a character being banished because he looks different from the other characters, carnivals and picnics taking place, characters doing specific dances and singing particular songs; and a similarity of names, such as Rockey Reef—Rocky Ridge, Snorkie—Snorky, Sandy Cove—Cool Current Cove. The similarities do not rise to the level of substantial similarity necessary for Plaintiff to maintain her case.

*Evans*, 681 F.Supp. at 817–818.[20]

For similar reasons, Roginski has failed to demonstrate the "striking similarities" that are necessary to infer that the defendants had access to his work. As stated in *Evans*, "[a]ny similarities in the works in question here are not explained only by copying, but are more accurately due to the same idea of an [environmental] setting and the general events that are common to any story." *Id.* at 818 n. 6. Other courts have also determined on a summary judgment record that there are no substantial similarities between a defendant's book or movie and a plaintiff's manuscript simply because both products have a common theme coupled with general

---

**20.** The term *scenes a faire* has been defined as "stock scenes that naturally flow from a common theme." *Beal v. Paramount Pictures*, 20 F.3d 454, 459 (11th Cir.1994), *cert. denied*, 513 U.S. 1062, 115 S.Ct. 675, 130 L.Ed.2d 607 (1994).

similarities. *See Beal v. Paramount Pictures,* 20 F.3d 454, 460–64 (11th Cir.1994) (finding that plaintiff's manuscript about a foreign prince traveling to America was not substantially similar to the defendant's movie "Coming to America"), *cert. denied,* 513 U.S. 1062, 115 S.Ct. 675, 130 L.Ed.2d 607 (1994); *McCormick v. Fugerson,* No. 94–3944, 1995 WL 580339, at *2–3 (E.D.Pa. Sept. 28, 1995) (finding that plaintiff's story about a "lion king" was not substantially similar to Disney's movie "The Lion King"), *aff'd mem.,* 82 F.3d 405 (3d Cir.1996); *Glanzmann v. King,* No. 88–70491, 1988 WL 212507, at *6 (E.D.Mich. Aug.29, 1988) (finding that plaintiff's story about an indestructible car which continually killed people was not substantially similar to defendant's story about a possessed car which also killed people and was able to restore itself), *affd. mem.,* 887 F.2d 265 (6th Cir.1989).[21]

Likewise in this case, Roginski has demonstrated a few coincidental similarities. He has not, however, presented evidence which would preclude a reasonable juror from determining that the defendants could not have independently created their comic book. In fact, it has been established that the "awesome possum" character was conceived prior to any effort on the part of Roginski. Given this independent creation of the "Awesome Possum," the remaining similarities between Roginski's manuscript and the defendants' comic book are simply matters which naturally flow from an environmental theme involving a superhero possum.[22]

**21.** It is important to note that these cases were decided on summary judgment motions in the context of the "substantially similar" test. As has been noted, this test is less stringent than the "striking similarity" test utilized to determine whether an inference of a defendant's access may be drawn. Despite the application of the more lenient test, the courts held that the commonality between these generalized themes coupled with minor similarities will not support a claim for copyright infringement. *See also Segal v. Paramount Pictures,* 841 F.Supp. 146, 149 (E.D.Pa.1993) ("The existence of some common features in the face of overwhelming differences between the works is insufficient to show substantial similarity."). These cases also belie Ro-

## IV. CONCLUSION

Although Roginski claims that defendants improperly copied his unpublished manuscript, he must first demonstrate that the defendants had reasonable access to the manuscript. Roginski has presented no evidence of direct access; instead, Roginski argues that defendants might have obtained access from the Copyright Office or the Library of Congress. A finding of access cannot rest on such speculation. Therefore, Roginski has failed to demonstrate that defendants had reasonable access to his manuscript.

Further, Roginski has also failed to demonstrate that defendants' product is so strikingly similar to Roginski's product that there is no reasonable manner in which it could have been independently created. It is undisputed that defendants independently created the concept of an "Awesome Possum" video game with an environmental theme. Roginski contends, however, that defendants used his manuscript to develop their comic book, which was included in the "Awesome Possum" instruction manual. Although Roginski has pointed to several general similarities, he has failed to demonstrate striking similarities from which an inference of access might be drawn. Given that there is no triable issue as to either access or copying, his copyright claim must fail. Therefore, defendants' motion for summary judgment will be granted. An appropriate Order is attached.

ginski's suggestion that the question of "striking similarity" should be submitted to the trier-of-fact. *Beal,* 20 F.3d at 459.

**22.** It should be mentioned that Roginski emphasizes that the defendants are confused as to who actually authored the comic book. Roginski claims that this confusion adds credence to his claim that the defendants' copied his manuscript. Roginski has the burden of demonstrating "striking similarities" between his manuscript and the defendants' comic book. The defendants' confusion over the actual author of the comic book simply does not provide a basis for submitting this case to a jury.

## ORDER

AND NOW, therefore, in accordance with the attached Memorandum, it is hereby **ORDERED THAT:**

1) The defendants' motion for summary judgment (Dkt. Entry 31) is **GRANTED.**

2) The Clerk of Court is directed to enter judgment in favor of the defendants and against the plaintiff.

3) The Clerk of Court is directed to mark this case closed.